**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **PEOPLESTRATEGY, INC.,** | **Case No. 2:20-cv-01901-JDW** |
| *Plaintiff* | |
| v. | |
| **HEARTHSTONE ADVISORS LLC, et al.,** | |
| *Defendants.* | |

## <u>MEMORANDUM</u>

Messy business arrangements lead, almost inexorably, to messy legal fights. That's the case here. In 2017, PeopleStrategy, Inc. and Timothy Padva entered into a partnership when PeopleStrategy acquired Mr. Padva's business. In 2018, they sought to unwind their partnership in part by spinning off a portion of PeopleStrategy's business to a new venture that Mr. Padva owned, Hearthstone Advisors LLC. Rather than a clean break, though, the parties envisioned an on-going relationship that saw the two connected and subject to a range of rules governing their relationship. Predictably, the blurred lines between them led to disputes, and now to two lawsuits.

The messy nature of the relationship also means that the factual record before the Court is, in many important respects, unclear. The Court cannot determine, for example, whether Mr. Padva acted on Hearthstone's behalf or on behalf of another entity at any particular time, or even whether a distinction among those entities exists. The Court also cannot determine whether some of PeopleStrategy's information that Mr. Padva divulged was confidential. Ultimately, these factual uncertainties mean that the Court must, in substantial part, deny the motions for summary judgment that both PeopleStrategy and Defendants have filed. A jury will have to resolve these factual issues.

I.      **BACKGROUND**

A.      **The Business Purchase Agreement**

PeopleStrategy provides human resource management products and solutions, as well as comprehensive employee benefits and insurance solutions to small and medium-sized businesses. In May 2017, Mr. Padva became a PeopleStrategy employee after PeopleStrategy acquired a company for which Mr. Padva served as CEO. Mr. Padva entered into an Employment Agreement with PeopleStrategy that contained restrictive covenants.

On June 15, 2018, PeopleStrategy entered into a Business Purchase Agreement with Hearthstone. Mr. Padva was Hearthstone's sole member, and he signed the BPA, but only on Hearthstone's behalf. The BPA terminated Mr. Padva's employment with PeopleStrategy. It also provided for the sale of PeopleStrategy's 401(k) retirement services and benefits business to Hearthstone. Section 3 of the BPA contains several restrictive covenants that bar "Padva and Hearthstone" from doing the following:

- For six months, competing with PeopleStrategy in any of its then-current business (with a limited exception not relevant here);

- Interfering with any of PeopleStrategy's relationships with its customers;

- Divulging any of PeopleStrategy's confidential information;

- For one year, hiring or soliciting any of PeopleStrategy's employees; and

- Soliciting or attempting to solicit PeopleStrategy's current or potential customers for the purpose of diverting their business relationships or otherwise interfering with any of PeopleStrategy's business relationships (including customers or suppliers).

(ECF No. 31-15 at § 3.) In the BPA, PeopleStrategy and Hearthstone agree to "provide the other party with appropriate business access to all records, files and documents" concerning the business that Hearthstone was acquiring. (*Id.* at § 4(d).) The BPA elects Pennsylvania law to govern it.

After execution of the BPA, PeopleStrategy allowed Mr. Padva to keep the laptop he used as a PeopleStrategy employee and to maintain access to PeopleStrategy's computer network, email, and electronic files. On October 4, 2019, PeopleStrategy and Hearthstone entered into an Addendum Agreement to the BPA. The Addendum terminated the restrictive covenants in Section 3 of the BPA.

### B.    Alleged Breaches Of The BPA

In July 2018, the month after the Parties entered into the BPA, Mr. Padva contacted iSolved HCM, a company that competes with PeopleStrategy, "in an effort to develop a business relationship to sell Hearthstone's 401K Retirement Benefits to iSolved's existing clients." (ECF No. 34-1 at ¶ 13.) On July 26, 2018, Mr. Padva emailed an iSolved representative and asked for pricing from iSolved for an upcoming planning session with another company with which he was partnering. Mr. Padva forwarded that information to Michael Gorker, who was a PeopleStrategy employee at the time.

From July 2018 through September 2019, Mr. Gorker worked with Mr. Padva on various business ideas and contributed to Mr. Padva's efforts. Throughout that time, Mr. Padva and Mr. Gorker exchanged various emails and draft business presentations/proposals that contained data that belonged to, or was derived from, PeopleStrategy. Mr. Padva introduced Mr. Gorker to a potential partner as the "Operational Leader" for a new business and included Mr. Gorker's title and salary in a "5-Year New Business Model" that he circulated. Mr. Gorker resigned from PeopleStrategy in April 2019.

Once the non-compete provision of the BPA expired on December 15, 2018, Mr. Padva began "explor[ing] opportunities into which [he] could expand Hearthstone's 401K retirement business."  (*Id.* at ¶ 14.) In pursuit of that plan, he "solicited the business of MC," a public accounting firm that is a PeopleStrategy client. (*Id.* at ¶ 15.) Mr. Padva "intended to partner with MC so that [he] could get access to its clients and sell additional payroll and HCM services, including employee benefits and 401K retirement benefits."  (*Id.*) Those efforts failed. According to Mr. Padva, his "business plan did not include and [he] never suggested that MC terminate its relationship with or use of PeopleStrategy's payroll services."  (*Id.*) MC remains a PeopleStrategy customer.

After Mr. Padva was unsuccessful in partnering with MC, he continued to pursue the same business plan and targeted three additional companies: Equinox Benefit Consulting; Mosaic Consulting; and Savoy Associates. Like his efforts with MC, Mr. Padva wanted to expand the employer services that those companies provided to their clients. In turn, he would generate additional revenue for Hearthstone, which would provide 401(k) services as part of the partnership. Mr. Padva sent business presentations and spreadsheets to these companies, some of which contained PeopleStrategy's information. None of these partnerships came to fruition.

Aside from working with Mr. Gorker in these efforts, Mr. Padva also reached out to some of his other former colleagues from PeopleStrategy: John Faherty; Michael Wiggins; and Eileen Bowers. On one occasion, Mr. Padva sent Mr. Faherty a product demonstration from a company called "Kronos." On another occasion, he asked Mr. Gorker to invite Mr. Wiggins and Ms. Bowers to a meeting that may also have had something to do with Kronos. PeopleStrategy employed all of these individuals when Mr. Padva contacted them.

In October 2019, after PeopleStrategy and Hearthstone entered into the Addendum Agreement to the BPA, Mr. Padva incorporated a new company, Lively Employment Services, Inc. Lively provides services similar to PeopleStrategy and competes with PeopleStrategy for clients.

### C.     Procedural History

#### 1.     The New Jersey action

On March 11, 2020, PeopleStrategy and its subsidiary CheckPoint, brought suit in the United States District Court for the District of New Jersey against Mr. Padva, Lively, and other former employees of PeopleStrategy for alleged violations of various confidentiality and non-solicitation agreements, misappropriation of trade secrets, tortious interference with contract and prospective economic benefits, violations of the Lanham Act, defamation, and trade libel. *See PeopleStrategy, Inc., et al. v. Lively Employer Services, Inc., et al.*, No. 3:20-cv-2640 (the "New Jersey Action"). On August 28, 2020, the Honorable Brian Martinotti granted a preliminary injunction against Mr. Padva and the other defendants. *See PeopleStrategy, Inc. v. Lively Emp. Servs., Inc.*, No. 3:20-cv-2640, 2020 WL 7869214 (D.N.J. Aug. 28, 2020). According to the docket in that matter, discovery is ongoing.

#### 2.     This action

On April 14, 2020, after initiating the New Jersey Action, PeopleStrategy filed suit against Mr. Padva and Hearthstone in this Court, asserting breach of contract claims against both Defendants based upon alleged violations of each of the restrictive covenants set forth in the BPA. On June 1, 2020, the Court denied Defendants' Motion to Transfer Venue to the District of New Jersey. The Parties coordinated their discovery efforts in both cases. PeopleStrategy has moved for partial summary judgment as to liability on four of its five breach of contract claims against

Defendants, leaving the damages calculation for a finder of fact. And Defendants have moved for partial summary judgment on four of the five claims as well. Those motions are ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). Thus, a blanket denial to an asserted fact, without more, is insufficient. "If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion; [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2)-(3).

The filing of cross-motions does not change this analysis. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an

agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* at 560 (quotation omitted). Rather, "[w]hen confronted with cross-motions for summary judgment 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Canal Ins. Co. v. Underwriters at Lloyd's London*, 333 F. Supp. 2d 352, 353 n.1 (E.D. Pa. 2004), *aff'd*, 435 F.3d 431 (3d Cir. 2006).

## III.   ANALYSIS

PeopleStrategy's claims against Mr. Padva and Hearthstone assert breaches of the restrictive covenants in the BPA. To prevail on its breach of contract claims, PeopleStrategy must prove "(1) the existence of a contract, including its essential terms[;] (2) a breach of the contract; and[ ] (3) resultant damages." *Doe v. Univ. of Scis.*, 961 F.3d 203, 211 (3d Cir. 2020) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)). The Parties' arguments implicate all three of these elements.

### A.   Padva's Obligations Under The BPA

No one disputes that the BPA was a valid contract, but the Parties do argue about whether it imposed obligations on Mr. Padva personally. The sole member of an LLC is not liable based just on his membership. *See Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 150 (Pa. Super. Ct. 2012). However, "a person acting as an agent may assume personal liability on a corporate contract where he executes a contract in his own name or voluntarily undertakes a personal responsibility. *Id.* (citing *B&L Asphalt Indus., Inc. v. Fusco*, 753 A.2d 264, 270 (Pa. Super. Ct. 2000)). The Court concludes that Mr. Padva did just that.

Under Pennsylvania law, "[w]hen interpreting a contract, the court's paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Doe*, 961 F.3d at 212 (quoting *Halpin v. LaSalle Univ.*, 639 A.2d 37, 39 (Pa. Super. Ct. 1994)). Thus, the Court must begin by examining "the express language of the agreement." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quotation omitted). If that language is clear and unambiguous, the Court must follow its plain meaning. *See Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012).

Mr. Padva did not sign the BPA in a personal capacity, only as Hearthstone's representative. But the BPA is capable of just one reasonable interpretation: that Mr. Padva agreed to undertake the restrictive covenants in his personal capacity, not just as Hearthstone's member. Section 3 of the BPA states that "Padva and Hearthstone **each** agrees" to the restrictive covenants. (ECF No. 31-15 at § 3 (emphasis added).) The word "each" connotes that the obligations run to Mr. Padva and to Hearthstone, separately. *See* Each, *New Oxford American Dictionary* 544 (3d ed. 2010) ("used to refer to every one of two or more people or things, regarded and identified separately"); *cf. Darrington v. Milton Hershey Sch.*, 958 F.3d 188, 195 n.8 (3d Cir. 2020) ("When interpreting contracts under Pennsylvania law, courts 'may look to dictionary definitions to' determine the plain meaning of a contract."). Then, the BPA states that "**[t]hey** shall not . . ." take certain actions. (ECF No. 31-15 at § 3.1 (emphasis added).) The word "they" is plural and reiterates that the obligation runs to two separate parties, Hearthstone and Mr. Padva. *See* They, *New Oxford* at 1801 ("used to refer to two or more people or things previously mentioned or easily identified"). To interpret the restrictive covenants to apply only to Mr. Padva when he wears a Hearthstone hat would be to ignore the words of this provision.

Other provisions in the BPA confirm that it applies to Mr. Padva personally, not just to Hearthstone. The BPA terminates Mr. Padva's employment with PeopleStrategy. Hearthstone, of course, was not a party to that employment. In addition, PeopleStrategy commits in the BPA to make payments due to Mr. Padva, in his personal capacity. These provisions demonstrate that the BPA applies, at least in some respects, to Mr. Padva in his personal capacity. Common sense also leads to that conclusion. Mr. Padva's employment agreement bound him to restrictive covenants in his personal capacity, so it makes sense that the restrictive covenants in the BPA would also apply to him personally.

This case is similar to *In re Estate of Duran*, 692 A.2d 176 (Pa. Super. Ct. 1997). There, the majority shareholder of a corporation sent a letter to one of the company's employees, promising to create a retirement plan for him. In the letter, the majority shareholder also promised to obtain a life insurance policy and list the employee as the beneficiary while the retirement plan was being set-up. Though "the ultimate obligation to set up a pension plan was on the corporation," the Superior Court held the shareholder's estate liable because the letter demonstrated that the shareholder "clearly undertook a personal obligation to purchase an insurance policy on his life in the *interim* before the establishment of a pension plan by the corporation." *Id.* at 179 (original emphasis). The facts that the letter was written on company letterhead and that the shareholder signed beneath the corporate name were not dispositive. The same is true here. The BPA states that PeopleStrategy and Hearthstone are the parties, and Mr. Padva appears to have signed the BPA as Hearthstone's representative, but the clear and unambiguous terms of the contract demonstrate that Mr. Padva undertook various personal obligations in Section 3 of the BPA.

**B.      Did Anyone Breach The BPA?**

**1.      Which acts might violate the BPA?**

**a.      Non-compete (BPA § 3(a)(1)(i))**

To avoid summary judgment on its claim under BPA Section 3(a)(1)(i), PeopleStrategy points to a single email exchange between Mr. Padva and iSolved. Mr. Padva explains in his declaration that he contacted iSolved—a company that provides payroll and human capital management services—"in an effort to develop a business relationship to sell Hearthstone's 401K Retirement Benefits to iSolved's existing clients." (ECF No. 34-1 at ¶ 13.) PeopleStrategy offers no evidence to contradict that explanation. Mr. Padva's efforts did not succeed, and Hearthstone never did any business with iSolved. These undisputed facts demonstrate that PeopleStrategy cannot prevail on its claim under Section 3(a)(1)(i) because Mr. Padva's contact with iSolved did not compete with PeopleStrategy.

The BPA prohibits Mr. Padva and Hearthstone from "compet[ing]" with PeopleStrategy, but it does not define what it means to "compete."  At the time Hearthstone and PeopleStrategy executed the BPA, "compete" meant "strive to gain or win something by defeating or establishing superiority over others who are trying to do the same[.]" Compete, *New Oxford* at 354. Mr. Padva's contact with iSolved does not fall within that definition. He was not trying to win anything from or establish superiority over PeopleStrategy. Instead, he was trying to get additional business from customers that had decided to use iSolved instead of PeopleStrategy. The BPA contemplated that Mr. Padva would operate Hearthstone separately from PeopleStrategy, and that's what Mr. Padva was doing. Therefore, the Court will grant Defendants summary judgment on PeopleStrategy's Section 3(a)(1)(i) claim.

      **b.**      **Customer non-solicitation/non-interference (BPA §§ 3(a)(1)(ii) & 3(a)(1)(v))**

PeopleStrategy's claims about violations of BPA Sections 3(a)(1)(ii) and 3(a)(1)(v) focus on Mr. Padva's contacts with PeopleStrategy's client MC. PeopleStrategy's claims based on this contact fail for at least two reasons. *First*, because Defendants did not consummate a deal with MC, they did not violate Section 3(a)(1)(ii), which only prohibits Defendants from "interfer[ing]" with PeopleStrategy's relationships in some "material" way. (ECF No. 31-15 at § 3(a)(1)(ii).) The BPA does not define "interfere" or "material."  When the BPA took effect, "interfere" meant "prevent (a process or activity) from continuing or being carried out properly[.]"  Interfere, *New Oxford* at 906. "Material" meant "important; essential; relevant[.]"  Material, *New Oxford* at 1079. MC remains a PeopleStrategy customer, it never did any business with Mr. Padva or Hearthstone, and PeopleStrategy offers no evidence that Mr. Padva's efforts prevented, or even disrupted, PeopleStrategy's sale of its services to MC. Defendants therefore did not interfere with PeopleStrategy's relationships in a material way.

    *Second*, Mr. Padva did not contact MC to get MC to shift business from PeopleStrategy to Hearthstone (or Lively). He solicited MC to "expand Hearthstone's 401K retirement business" by getting access to MC's client base. (ECF No. 34-1 at ¶¶ 14-15.) That is, Mr. Padva wanted to leverage his contacts with MC to sell Hearthstone's services to MC's clients, not to MC itself. (ECF No. 31-37 at ¶ 7; 31-4 at ¶ 15.) PeopleStrategy does not offer any evidence that refutes these facts or somehow establishes that it shared the same clients with MC that Defendants were trying to solicit. Instead, it just contends that "[a]ny argument by Defendants that a joint venture with MC *to provide the exact same services* as those that PeopleStrategy was currently providing to MC would not disrupt PeopleStrategy's relationship with MC defies common sense."  (ECF No. 31-2 at 16 (original emphasis).) But that is argument, not evidence. And, while courts can use

"common sense" to assess evidence, they should not do so to fill evidentiary gaps. In the absence of some admissible evidence showing that Defendants solicited or enticed a PeopleStrategy client, Mr. Padva's contacts with MC do not establish a violation of the BPA.

### c.       Confidentiality (BPA § 3(a)(1)(iii))

Fact questions prevent the Court from awarding any party summary judgment with respect to PeopleStrategy's claims concerning the breach of Section 3(a)(1)(iii), which required Defendants to maintain the confidentiality of PeopleStrategy's "Confidential Information." (ECF No. 31-15 at § 3(a)(1)(iii).) It is undisputed that Mr. Padva divulged information that belonged to PeopleStrategy, including client contact information, client proposals, and pricing information. Although Defendants sometimes dispute PeopleStrategy's factual assertions concerning confidentiality, they do not offer any competing evidence. A mere denial, without more, does not suffice under Rule 56, though. So the Court will treat those facts as undisputed.

It is not clear whether all, or any, of the information that Mr. Padva disclosed was "Confidential Information." Although the BPA uses the term "Confidential Information" with capital letters, it does not define that term. The plain meaning of "confidential" is "intended to be kept secret[.]" Confidential, *New Oxford* at 364. PeopleStrategy points to the type of information at issue to establish that it is confidential. And, certainly, customer lists, revenue information, notes about client relationships, and pricing tools, among other things, **might** be confidential. But not always.

PeopleStrategy has not established that any particular piece of information was confidential at the time Mr. Padva disclosed it, even if it fell into a category of information that PeopleStrategy asked its employees to protect. At the same time, Defendants offer evidence that PeopleStrategy chose to disclose some of the information, such as customer lists, under circumstances that suggest that PeopleStrategy did not consider it to be confidential. PeopleStrategy relies on Judge

Martinotti's conclusion in the New Jersey Action that PeopleStrategy "utilized reasonable measures to protect proprietary business information." *PeopleStrategy, Inc.*, 2020 WL 7869214 at \*5. That decision is not binding at this stage of these proceedings. *See Parkell v. Senato*, 639 F. App'x 115, 117 (3d Cir. 2016) ("[A] court's findings and conclusions at the preliminary injunction stage are by nature *preliminary* . . . , and therefore are not binding at summary judgment.") (quoting *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 528 n.4 (7th Cir. 2000)) (original emphasis); *see also Clark v. K-Mart Corp.*, 979 F.2d 965, 969 (3d Cir. 1992) ("[B]ecause of the limited nature of the proceedings resulting in the preliminary injunction, any findings of fact and conclusions of law made at the preliminary stage are of no binding effect whatsoever.") (citation omitted).

Defendants' summary judgment arguments fare no better. They argue that PeopleStrategy terminated Mr. Padva's confidentiality obligations when it terminated his employment agreement, but the Court has already concluded that the BPA imposed confidentiality obligations on Mr. Padva personally. They also argue that PeopleStrategy did not do enough to protect its information. But the facts show that PeopleStrategy required employees to sign confidentiality obligations, and it secured such a commitment from Mr. Padva after the termination of his employment. Although PeopleStrategy allowed Mr. Padva to continue to access its confidential information after his employment ended, it did so for a specific purpose and subject to a confidentiality obligation. The record, taken in the light most favorable to PeopleStrategy, therefore reveals that PeopleStrategy protected information that it now claims was secret.

### d.    Employee non-solicitation (BPA § 3(a)(1)(iv))

PeopleStrategy argues that Defendants solicited or encouraged Messrs. Gorker, Wiggins, and Faherty and Ms. Bowers to work for one or both Defendants, but PeopleStrategy does not argue that they hired any of them. The BPA does not define "solicit" or "encourage." At the time

the parties executed the BPA, "solicit" meant to "ask for or try to obtain (something) from someone," Solicit, *New Oxford* at 1662, and "encourage" meant to "give support and advice to (someone) so that they will do or continue to do something[;] . . . help or stimulate (an activity, state, or view) to develop[.]"  Encourage, *New Oxford* at 571. In the New Jersey Action, Judge Martinotti concluded that Mr. Padva encouraged Messrs. Gorker, Wiggins, and Faherty to misappropriate PeopleStrategy's trade secrets and use that information to solicit PeopleStrategy's clients, but that decision is not binding. *See Parkell*, 639 F. App'x at 117; *Clark*, 979 F.2d at 969. The Court must review the evidence based on a fully-developed record.

The undisputed facts establish that, from July 2018 until Mr. Gorker resigned from PeopleStrategy in April 2019, Mr. Padva and Mr. Gorker worked together to start a new business venture. It is unclear who initiated those activities, but the undisputed evidence demonstrates that Mr. Padva helped to create a new opportunity for Mr. Gorker. While Mr. Gorker worked for PeopleStrategy, Mr. Padva introduced Mr. Gorker as the "Operational Leader" for his new business, and he included Mr. Gorker's title and salary in a "5-Year New Business Model."  (ECF No. 31-11; ECF No. 31, Ex. P.) This undisputed evidence demonstrates that Mr. Padva took steps to encourage Mr. Gorker to leave his employment with PeopleStrategy.

Defendants did not respond to this issue in their opposition brief. Instead, they waited until filing a sur-reply to state (in a conclusory fashion and without any evidentiary support) that "[t]here is no evidence that Defendants breached their obligation not to solicit PeopleStrategy employees." (ECF No. 42 at 6.) That belated and cursory assertion does not overcome the undisputed evidence. The Court will grant summary judgment against Mr. Padva based on his encouragement of Mr. Gorker to leave PeopleStrategy.

PeopleStrategy has not mounted enough evidence concerning its other former employees. For each of them, it identifies only a single communication, without enough context to permit the Court to determine its purpose or significance. For Mr. Faherty, the only communication that PeopleStrategy identifies is an email that Mr. Padva forwarded to Mr. Faherty on March 1, 2019, with a link to a Kronos product demonstration. The email has no commentary or discussion. For Mr. Wiggins and Ms. Bowers, the only communication that PeopleStrategy identifies is a text message from June 13, 2019, in which Mr. Padva told Mr. Gorker to "send GoTo invite to Mike Wiggins and Eileen." (ECF No. 31-26.) The text string includes a reference to Kronos but does not disclose the subject of the meeting or the reason for inviting Mr. Wiggins and Ms. Bowers. The Court cannot conclude as a matter of law that Mr. Padva violated the BPA on such a sparse record.

## 2. Genuine factual disputes exist about whether Mr. Padva was acting for Hearthstone or Lively

Factual disputes prevent the Court from determining whether Mr. Padva was acting on behalf of Hearthstone, or on Lively's behalf, when he took the actions at issue. PeopleStrategy has identified evidence that suggests Mr. Padva was acting for Hearthstone. He sent emails both before and after he incorporated Lively to Savoy Associates and Equinox Benefit Consulting as part of a business plan to "expand Hearthstone's 401K retirement business" and to "generate additional revenue for all of the parties involved, including Hearthstone." (ECF No. 34-1 at ¶¶ 14, 16.) These contacts suggest, at a minimum, that Hearthstone was always part of Mr. Padva's efforts.

Other facts in the record suggest that Mr. Padva undertook at least some acts on Lively's behalf. His initial email to Savoy referenced a "Newco Opportunity" at a time that Hearthstone existed but Lively did not. (ECF No. 31, Ex. 131.) Mr. Padva's reference to a "Newco" at least raises the possibility that he was referencing Lively. In addition, Mr. Padva states in his own

Declaration that he only used PeopleStrategy's information in connection with Lively, not with Hearthstone. (ECF No. 34-1 at ¶ 23.)

PeopleStrategy tries to get around this problem by arguing that Mr. Padva, Hearthstone, and Lively were "inextricably comingled." (ECF No. 39 at 3.) But the only evidence that it musters on that point is an overlap in ownership between Hearthstone and Lively, the fact that Mr. Padva used the same computer for work for both companies, and Hearthstone's lack of an internal email system. Without more, that evidence does not permit the Court to pierce the corporate veil or to hold that Lively and Hearthstone are alter-egos of each other. *See E. Mins. & Chemicals Co. v. Mahan*, 225 F.3d 330, 333 n.7 (3d Cir. 2000) (stating test for finding of alter egos).

On this record, the Court cannot say for certain what hat Mr. Padva was wearing at any given time. The Court cannot grant Hearthstone summary judgment based on its argument that Mr. Padva did not act on its behalf. But the Court also cannot grant PeopleStrategy's motion against Hearthstone without a jury determination that Mr. Padva was acting for Hearthstone if and when he violated the BPA. Also, because a jury must decide whether Mr. Padva was acting on behalf of Hearthstone or Lively when he engaged in the alleged prohibited conduct, the Court cannot resolve Defendants' argument that PeopleStrategy is attempting to recover "double damages" by asserting claims here based on the same conduct alleged in the New Jersey Action. (*See* ECF No. 37-3 at 10.)

### C.    Did Any Breach Cause Damages

Defendants argue that PeopleStrategy cannot satisfy the damages element of its claims. Their argument comes down to an argument that PeopleStrategy cannot rely on its expert, Thomas Hoberman, to establish damages because his analysis is inadmissible under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The Court's policies and procedures make clear that: "[i]f

a party's motion for summary judgment, or an opposition thereto, is based in whole or in part on an argument that expert testimony is not admissible, the party must raise such argument in a contemporaneous *Daubert* motion."   Policies and Procedures, Section II.B.4, *available at* https://www.paed.uscourts.gov/documents/procedures/wolpol.pdf.   Defendants' brief illustrates the reasons for this policy. Whether an expert employed a reliable methodology is a complicated inquiry that requires thorough briefing and analysis. Defendants, short of space, provide none of that. They recite the law but offer no analysis of Mr. Hoberman's opinion. They just assert that his calculation is "speculative."  (ECF No. 37-3 at 22.) When the Parties submitted their joint report to the Court pursuant to Federal Rule of Civil Procedure 26(f), their Counsel represented that they reviewed the Court's Policies and Procedures and acknowledged the requirements contained in those Policies.

In the absence of a fully-developed *Daubert* motion, the Court will assume that Mr. Hoberman's testimony will be admissible. That testimony establishes that PeopleStrategy suffered damages from Defendants' various breaches.

## IV.    CONCLUSION

The Court will grant Defendants summary judgment on PeopleStrategy's claims based on BPA Sections 3(a)(1)(i), (ii), and (v). The Court will grant PeopleStrategy summary judgment on its claim against Mr. Padva for his encouragement of Mr. Gorker to leave PeopleStrategy in violation of BPA Section 3(a)(1)(iv). The Court will otherwise deny the summary judgment motions. An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

April 16, 2021